## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN

**FATHER SAMA MUMA**, an individual

       Plaintiff,

   v

                                    Hon.
                                    Case No.

                                    **JURY TRIAL DEMANDED**

**HAPPY SMILES, LLC**, a Nevada limited liability company; **AUTOMATION ALLIANCE GROUP LLC**, a Delaware limited liability company; **NICK RAFAEL MOCUTA**, an individual; and **JESSE REGAN**, an individual

       Defendants.

---

CND LAW GROUP PLLC
David M. Dell (P61778)
Attorneys for Plaintiff
33762 Schoolcraft Road,
Livonia, Michigan 48150
Phone: (734) 427-2030
Fax: (734) 427-3004

---

CND LAW ◊ ATTORNEYS & COUNSELORS

## COMPLAINT

    **NOW COMES**, Rᴇᴠ. Sᴀᴍᴀ Mᴜᴍᴀ, an individual, by and through its attorneys, **CND LAW**, and for its Complaint, states:

### *PARTIES*

1.    Plaintiff, **Rᴇᴠ. Sᴀᴍᴀ Mᴜᴍᴀ**, an individual, resides at 5622 Summers Road, North Branch, County of Lapeer and State of Michigan.

2.      On information and belief, Defendant, **HAPPY SMILES, LLC**, ("Happy Smiles") is a Nevada limited liability company that has conducted business in the County of Lapeer and State of Michigan thru its business actions on the internet and contacts with Plaintiff as alleged within this Complaint.

3.      On information and belief, Defendant, **AUTOMATION ALLIANCE GROUP, LLC** ("Automation"), is a Delaware limited liability company that has conducted business in the County of Lapeer and State of Michigan thru its business actions on the internet and contacts with Plaintiff as alleged within this Complaint.

4.      Defendant, **JESSE REGAN** ("Regan"), an individual acting as an agent for Automation and Happy Smiles. On information and belief, Regan resides in Colorado. Regan has conducted business in the County of Lapeer and State of Michigan thru his contacts with Plaintiff as alleged within this Complaint.

5.      Defendant, **NICK RAFAEL MOCUTA** ("Mocuta"), an individual acting as an agent for Automation as well as the Chief Executive Officer of Happy Smiles. On information and belief, Mocuta resides in Oregon. Mocuta has conducted business in the County of Lapeer and State of Michigan thru his contacts with Plaintiff as alleged within this Complaint.

### *JURISDICTION and VENUE*

6.      Pursuant to 28 U.S.C. 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiff under 18 U.S.C. 1961, *et seq.* because they arise under the laws of the United States.

7.      Supplemental jurisdiction over the plaintiff's state law claims is proper pursuant to 28 U.S.C. 1367.

**8.**     This Court has jurisdiction over the Defendants because the Defendants have established minimum contacts with the State of Michigan by, among other things, entering into a contract with a Michigan resident, such that the exercise of personal jurisdiction will not offend traditional notions of fair play and substantial justice.

**9.**     Venue is proper pursuant to 28 U.S.C. 1392(b)(2) whereas the vast majority of the acts as issue in this Complaint were carried out within the Eastern District of Michigan.

### *COMMON ALLEGATIONS*

**10.**     In December of 2020, Plaintiff requested information from Defendants regarding starting a dropshipping company ("Dropshipping Business").

**11.**     Dropshipping is an order fulfillment option that allows an ecommerce business to outsource procuring, storing, and shipping products to a third party.

**12.**     On December 5, 2020, Plaintiff received an email from Regan scheduling a call with Automation.

**13.**     Prior to conducting the call, Defendants required Plaintiff to watch a FAQ video ("Video") that was sent to Plaintiff via email.

**14.**     In the Video, Mocuta pitches a vague system in which individuals, such as Plaintiff, may avail themselves of a business opportunity to make money through the Dropshipping method.

**15.**     In the Video, Mocuta demonstrates a sales program which will enable a purchaser such as Plaintiff to derive income through the sale of products. In this demonstration, Mocuta reveals the accounts of several other clients showing gross monthly sales ranging from approximately $40,000 to over $90,000 as well as gross yearly sales ranging from approximately $100,000 to over $250,000.

**16.**     After the demonstration by Mocuta, the Video continues with another representative from Automation advising Plaintiff to not operate a Dropshipping Business on Walmart Plus because Walmart Plus will not allow that type of business to operate on its website.

**17.**     Plaintiff is advised to start a Walmart Wholesale Business instead of a Dropshipping Business.

**18.**     In the Video, a "get-rich" scheme is pitched where an individual such as Plaintiff would not have to do anything other than pay a fee to Automation.

**19.**     The Video provides vague explanations as to what services are being provided by Defendants.

**20.**     The Video also represents that Plaintiff would receive, and operate, a Walmart Wholesale account plus a Facebook Dropshipping store.

**21.**     In January of 2021, Plaintiff advised Regan and Automation that he had watched the video and wanted to schedule a phone conversation to ask some questions about the business model.

**22.**     During the call on January 26, 2021, Automation's representative and Regan represented that Plaintiff would be able to operate a Dropshipping Business to sell products through Walmart Plus in exchange for an initial fee of $22,500.00.

**23.**     After advising Defendants that Plaintiff could not afford to pay the initial fee, Defendant Regan persuaded Plaintiff to apply for a loan from Pennsylvania State Employees Credit Union ("PSECU") to assist with the Down Payment.

**24.**     In February 2021, Plaintiff received a phone call from Regan advising him that Plaintiff's loan was approved. On information and belief, Regan is not employed by PSECU.

25.     On February 17, 2021, Plaintiff and Defendants executed the Walmart Account Management Services Agreement (the "Agreement") attached as **Exhibit 1**. Defendants drafted the Agreement and emailed it to Plaintiff in Michigan.

26.     The Agreement provides that "[t]he Services to be provided by Happy Smiles are only the following:  Perform all management functions for the Walmart Drop Shipping Business, including but not limited to, customer service, product research and order fulfillment, all the while excluding any management of any of Your financial accounts" ("Services"). The Agreement does not elaborate on these services.

27.     Importantly, the Agreement neither mentions the Walmart Wholesale Business nor the Facebook Dropshipping store; rather, it states that the Dropshipping Business is against Walmart Plus's terms of service.

28.     On March 4, 2021, Plaintiff received the wiring instructions from Regan and he wired the funds in the amount of $22,500.00 ("Funds") to Defendants from Plaintiff's bank in Michigan.

29.     The Agreement also provides that Defendants are not obligated to provide any Services until all fees are paid. The Agreement defines fees as the Down Payment plus 50% of the weekly profits starting the first week of the Agreement.

30.     Plaintiff contacted legal counsel to set up a Limited Liability Company to continue with setting up the account he purchased from Defendants.

31.     Upon reviewing the Agreement, Plaintiff's counsel confirmed that the Agreement states that the Dropshipping Business was in violation of the terms of service for Walmart Plus.

32.     In other words, Walmart Plus does not allow a third party, such as Plaintiff, to operate a Dropshipping Business through its website.

**33.**    Prior to sending the Agreement to Plaintiff and receiving Funds, Defendants were aware that Walmart Plus would not allow Plaintiff to conduct a Dropshipping Business on its website.

**34.**    Plaintiff also accepted the Funds with the knowledge that the Walmart Wholesale Store or Facebook Dropshipping Store was not part of the written Agreement.

**35.**    Due to the conduct of Defendants, Plaintiff has suffered embarrassment, humiliation, stress, anxiety and other emotional distress.

**36.**    Due to the conduct of Defendants, Plaintiff has suffered money damages as well as attorney fees and other costs.

**COUNT I – VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**

**37.**    Plaintiff realleges the allegations in preceding Paragraphs of this Complaint as though fully restated here.

**38.**    Defendants are engaged in "trade or commerce" within the meaning of MCL 445.902(1)(g) of the MCPA.

**39.**    Plaintiff is a "person" within the meaning of MCL 445.902(1)(d) of the MCPA.

**40.**    Defendants, by representing that Plaintiff would be operating a Dropshipping Business on Walmart Plus, violated MCL 445.903(1)(a), (b), (c), (e), (n), (s), (bb), and (cc) of the MCPA.

**41.**    Plaintiff is a person who has suffered a loss within the meaning of MCL 445.911(2).

**42.**    Pursuant to MCL 445.911(2), Plaintiff requests a monetary judgment for the actual damages he sustained or $250, whichever is greater, together with reasonable attorney fees, interest, and costs.

**WHEREFORE**, Plaintiff asks this Honorable Court for a judgment against Defendant in an amount in excess of twenty-two thousand five hundred and 00/100 ($22,500.00) dollars, plus

costs and attorney fees, together with such other remedies as this Court should deem just and equitable.

## *COUNT II – FRAUDULENT MISREPRESENTATION*

**43.**     Plaintiff realleges the allegations in preceding Paragraphs of this Complaint as though fully restated here.

**44.**     Defendants intentionally made false representations of material facts to Plaintiff that Walmart Plus would allow him to conduct the Dropshipping Business on its website.

**45.**     Defendants also intentionally made false representations of material facts to Plaintiff regarding the type of account being purchased and the services being provided.

**46.**     Defendants' representations were false when they were made.

**47.**     Defendants knew that their representations were false when they were made, or Defendants made them recklessly, without knowing whether they were true.

**48.**     Defendants intended that Plaintiff would rely on the representations.

**49.**     Plaintiffs relied on Defendants' false representations when her transferred funds totaling $22,500.00 to Defendants.

**50.**     As a result of Defendants' fraudulent misrepresentations, Plaintiff has suffered substantial economic losses.

     **WHEREFORE**, Plaintiff asks this Honorable Court for a judgment against Defendant in an amount in excess of twenty-two thousand five hundred and 00/100 ($22,500.00) dollars, plus costs and attorney fees, together with such other remedies as this Court should deem just and equitable.

## COUNT III – INNOCENT MISREPRESENTATION

**51.**    Plaintiff realleges the allegations in the preceding Paragraphs of this Complaint as though fully restated here.

**52.**    Defendants' representations, as set forth in the preceding paragraphs, were made in connection with the making of a contract between Plaintiff and Defendant.

**53.**    Plaintiff would not have wired $22,500 to Defendants if they had not made the representations.

**54.**    Plaintiff suffered substantial economic losses as a result of entering into the contract, and his losses benefitted Defendant.

   **WHEREFORE**, Plaintiff asks this Honorable Court for a judgment against Defendant in an amount in excess of twenty-two thousand five hundred and 00/100 ($22,500.00) dollars, plus costs and attorney fees, together with such other remedies as this Court should deem just and equitable.

## COUNT IV – CONVERSION UNDER MCL 600.2919a

**55.**    Plaintiff realleges the allegations in the preceding Paragraphs of this Complaint as though fully restated here.

**56.**    Michigan's Statutory Conversion statute, MCL § 600.2919a, provides as follows:,

   1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
    (a) Another person's stealing or embezzling property or converting property to the other person's own use.
    (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

**57.**    Plaintiff transferred funds to Defendants based on their misrepresentations regarding the Agreement and Services that would be provided.

58.     Defendants' failure to return Plaintiff's property, which was fraudulently received, unduly deprived Plaintiff of the benefit of his property.

59.     By way of their deception, Defendants stole, embezzled and converted the Funds used for the Down Payment.

60.     Defendants' fraudulent conversion of Plaintiff's property entitles Plaintiff to recover Damages 3 times his actual damages and attorney fees under MCL 600.2919a.

WHEREFORE, Plaintiff asks this Honorable Court for a judgment against Defendant in an amount of sixty-seven thousand five hundred and 00/100 ($67,500.00) dollars, plus costs and attorney fees, together with such other remedies as this Court should deem just and equitable.

### COUNT V - UNJUST ENRICHMENT/QUANTUM MERUIT

61.     Plaintiff realleges the allegations in Paragraphs 1 through 25 of this Complaint as though fully restated here.

62.     The Agreement provides for no legal consideration to be given by Defendants despite the fact that it receives consideration from Plaintiff.

63.     Consideration is required to create a valid contract. *Prentis Family Found, Inc. v Barbara Ann Karmanos Cancer Inst*., 266 Mich App 39, 58; 698 NW2d 900 (2005); Estate of Osborn v Kemp, 991 A2d 1153;2010 Del. LEXIS 135.  *Higgins v Monroe Evening News*, 404 Mich 1; 272 NW2d 537 (1978) states, "[c]onsideration is a legal detriment that has been bargained for in exchange for a promise."  There must be "a benefit on one side, or a detriment suffered, or service done on the other." *GMC v Department of Treasury*, 466 Mich 231, 238-239; 644 NW2d 734 (2002) (quoting Piastray Corp. v Cole, 324 Mich 433, 440; 37 NW2d 162 (1949)).

64.     Due to the lack of consideration, the Agreement is void and there is no contract between the parties.

**65.**     By Defendants conduct of accepting twenty-two thousand five hundred and 00/100 ($22,500.00) dollars, without any consideration being given on their part, Defendants has been unjustly enriched to the detriment of Plaintiff.

**66.**     Defendants have not conferred any benefit on Plaintiff and Defendant acts wrongfully in retaining the Funds.

**67.**     Plaintiff did not intend that Defendants would retain that benefit (i.e. Funds) without just compensation, and Plaintiff has otherwise acted equitably in this matter.

**68.**     That it would be inequitable for Defendant to profit from its wrongful conduct at Plaintiff's expense.

WHEREFORE, Plaintiff asks this Honorable Court for a judgment against Defendant in an amount in excess of twenty-two thousand five hundred and 00/100 ($22,500.00) dollars, plus costs and attorney fees, together with such other remedies as this Court should deem just and equitable.

### COUNT VI – VIOLATION OF 18 U.S.C. SEC. 1962(C)

**69.**     Plaintiff realleges the allegations in preceding Paragraphs of this Complaint as though fully restated here.

**70.**     18 U.S.C. Sec. 1961(1)(B) defines racketeering activity as "(B) any act which is indictable under any of the following provisions of title 18, United States Code:...section 1343 (relating to wire fraud)."

**71.**     18 U.S.C. Sec 1343 states that someone is guilty of fraud by wire if they have "devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any

writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice,". Defedants used email and telephone communication to deprive Plaintiff of his property.

72.     Defendants constitute an enterprize as defined by 18 U.S.C. Sec 1961(4) an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

73.     18 U.S.C. 1961(5) states that a "pattern of racketeering activity" "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

74.     The allegations in this complaint clearly constitute fraud 18 U.S.C. Sec. 1343, Thus the actions of the Defendants in this case meet the definition of racketeering activity. Defendants actions are completely in line with their regular course of business. In Fact, their entire business model is fraudulent. Thus, their actions qualify as a Pattern of Racketeering activity under 18 U.S.C. 1961(5).

75.     18 U.S.C. 1962 (c) states that "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Defendants action unlawfully deprived Plaintiff of the use and enjoyment of his property.

76.     18 U.S.C. 1964(c) provides that person injured by a violation of section 1962 "may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fees."

**WHEREFORE**, Plaintiff asks this Honorable Court for a judgment against Defendant in an amount of sixty-seven thousand five hundred and 00/100 ($67,500.00) dollars, plus costs and attorney fees, together with such other remedies as this Court should deem just and equitable.

### COUNT VII – PROMISSORY ESTOPPEL

77.     Plaintiff realleges the allegations in preceding Paragraphs of this Complaint as though fully restated here.

78.     On or about December 5 and 6, 2021, Defendants explicitly promised Plaintiff that if Plaintiff provided the $22,500, Defendants would provide Services to enable Plaintiff to start a Drop Shipping Business on Walmart Plus.

79.     Defendants' promise was clear, definite, and unequivocal and was specifically made to induce Plaintiff to pay $22,500 to Defendants.

80.     In reliance on the promise, and to his substantial detriment, Plaintiff paid the funds.

81.     Defendants have refused to provide the Services.

82.     Moreover, Walmart Plus does not allow Plaintiff to operate a Dropshipping Business on its website.

83.     At the time of making the promise and inducing the action on Plaintiff's part, Defendants could reasonably foresee that their failure to perform pursuant to the promise would cause the damages Plaintiff has suffered.

84.     As a direct and proximate result of Defendants' failure to perform, Plaintiff has suffered damages in excess of $25,000.

**WHEREFORE**, Plaintiff asks this Honorable Court for a judgment against Defendant in an amount exceeding twenty-two thousand and 500/100 ($22,500.00) dollars, plus costs and attorney fees, together with such other remedies as this Court should deem just and equitable.

## COUNT VIII – COMMON LAW CONVERSION

**85.**     Plaintiff realleges the allegations in preceding Paragraphs of this Complaint as though fully restated here.

**86.**     Plaintiff is the owner of the Funds and has the right to immediate possession.

**87.**     The Defendants have wrongfully exerted dominion over the Funds in denial or inconsistent with Plaintiff's rights.

**88.**     Plaintiff has suffered actual damages.

**WHEREFORE**, Plaintiff asks this Honorable Court for a judgment against Defendant in an amount exceeding twenty-two thousand and 500/100 ($22,500.00) dollars, plus costs and attorney fees, together with such other remedies as this Court should deem just and equitable.

## COUNT IX – CIVIL CONSPIRACY

**89.**     Plaintiff realleges the allegations in preceding Paragraphs of this Complaint as though fully restated here.

**90.**     Defendants illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of defrauding Plaintiff out of $22,500.00.

**91.**     Defendants, in combination, conspired to defraud Plaintiff and induce him to pay $22,500 for a business which was not possible due to Walmart Plus' terms of service.

**92.**     This conspiracy resulted in the illegal, unlawful, or tortious activity of fraud, larceny and conversion.

**93.**     As a result of the conspiracy and Defendants' illegal, wrongful, or tortious acts, Plaintiff sustained the following damages in the amount of $22,500.00 along with emotional distress.

**94.**     Defendants are liable to Plaintiff for all of his injuries and damages.

**WHEREFORE**, Plaintiff asks this Honorable Court for a judgment against Defendant in an amount exceeding twenty-two thousand and 500/100 ($22,500.00) dollars, plus costs and attorney fees, together with such other remedies as this Court should deem just and equitable.

### *JURY DEMAND*

Plaintiff respectullf demands a trial by jury on all issues triable by jury.

Respectfully Submitted,

**CND LAW**

Dated:  February 25, 2022

/s/ David M. Dell
David M. Dell (P61778)
Attorney for Plaintiff
33762 Schoolcraft Road,
Livonia, Michigan 48150
Phone:  (734) 427-2030
Fax:  (734) 427-3004

CND LAW ◊ ATTORNEYS & COUNSELORS

# EXHIBIT 1

## WALMART ACCOUNT MANAGEMENT SERVICES AGREEMENT

This Account Management Services Agreement (the **"Agreement"**), entered into on 2021-02-17 (the **"Execution Date"**), sets for the terms and conditions whereby Automation Alliance Group LLC (**"Automation Alliance"**) the Sales Partner, having its principal place of business at 651 Broad Street Suite 206, Middletown, DE 19709 and Happy Smiles LLC **("Happy Smiles")** the Operations Partner, having its principal place of business at 9120 Double Diamond Parkway Box H271, Reno, Nevada, 89521, agrees to provide certain services (as described on Schedule A) to the undersigned ("**You**"). You and Happy Smiles hereby agree as follows:

**1)** **Services**. You hereby engage Happy Smiles, and Happy Smiles accepts such engagement, to provide You with the services described on Schedule A (the "**Services**") in connection with the management of Your Walmart seller account (the "**Account**") and store (the "**Store**", and with the Account, the "**Walmart Business**"), which You represent when You sign this Agreement.

**2)** **Term and Termination**. This Agreement starts when You sign it (the "**Term**"). Happy Smiles may terminate this Agreement immediately if You fail to make any required payment to Happy Smiles. If this Agreement ends, Happy Smiles will stop performing Services but You will remain responsible for all sums due to Happy Smiles. The client can terminate the agreement at any time, with 30-day notice to Happy Smiles.

**3)** **Payment**. You will pay Automation Alliance the initial fee and then the revenue share will be paid to Happy Smiles weekly as set forth on Schedule A (the "**Fees**"), and until the Fees are paid in full, Happy Smiles shall have no obligation or liability to perform any Services.

**4)** **Relationship of the Parties**. You agree Happy Smiles is an independent contractor, not your employer, employee, partner, agent or joint relator, and that you have no control over when, where, and how Happy Smiles will carry out and/or perform the Services.

**5)** **Confidentiality and Non-Disclosure.** You acknowledge that, during the Term of this Agreement, You will receive certain information (whether oral, written, electronic, or other) that Happy Smiles considers confidential or proprietary, including, the terms and existence of this Agreement ("**Confidential Information**").

**a.** You will not, during or subsequent to the Term of this Agreement, use any Confidential Information for any purpose other than to perform your obligations under this Agreement. You also agree to take all reasonable steps to prevent any unauthorized disclosure of Happy Smiles Confidential Information.

**b.** Nothing herein shall prevent You from disclosing information that is already generally available to the public (but not because You caused the information to be publicly available) or that You created on Your own without using any of Happy Smiles Confidential Information.

**c.** At the end of the Term, you must return or destroy all of Happy Smiles Confidential Information in your possession and confirm that it has done so. You also agree that your obligations of confidentiality, non-disclosure and non-use will continue with respect to any of Happy Smiles trade secrets disclosed to you during that Term will continue as long as the information remains a trade secret under applicable law.

**6)** **Ownership and Licenses**.

**a.** Each party shall own all right, title and interest in and to its intellectual property rights existing before the Execution Date of this Agreement or developed solely and exclusively by each party during the Term of this Agreement ("**Preexisting IP**"). Nothing in this Agreement shall be construed as conferring to You by implication, estoppel or acquiescence any right,

title and interest in and to Happy Smiles Preexisting IP.

**b.** At all times, Happy Smiles is and shall remain the sole and exclusive owner of all right, title, and interest, including all related intellectual property rights, in and to any know-how, ideas, concepts, inventions, routines, methodologies, processes, libraries, tools or technologies created, developed, adapted or used by Happy Smiles, (i) whether before the Execution Date of this Agreement or during the Term of this Agreement, including any improvements, enhancements, modification and derivative works created thereof and (ii) whether developed solely by Happy Smiles or in conjunction with others, including Yourself.

**c.** In case Happy Smiles incorporates any of its Preexisting IP into the Walmart Business, You are granted a limited, revocable, non-assignable, non-sublicensable license to use such Preexisting IP solely for the purpose of operating in the Walmart Business. For the avoidance of doubt, such license shall terminate, and will not survive, any termination of this Agreement.

**d.** You are and will be the sole and exclusive owner of all right, title, and interest in and to the results and proceeds of, the Walmart Business; provided, however, that any intellectual property used or created by Happy Smiles, whether individually, on Your behalf, or jointly with You, with respect thereto, shall be and will be owned by Happy Smiles. Happy Smiles will not have any control or ownership of your Walmart Business at the end of the Term or upon any termination of this Agreement.

**e.** You hereby grant to Happy Smiles a non-exclusive, worldwide, irrevocable, royalty-free license to edit, modify, adapt, translate, exhibit, publish, transmit, participate in the transfer of, reproduce, create derivative works at Your direction from, distribute, perform, display and otherwise use any of Your documents, data, know-how, ideas, specifications, software code, and other materials that have been provided to Happy Smiles by or on Your behalf (the "**Content**") as necessary to render the Services

under this Agreement. For the avoidance of doubt, such license shall not terminate, and will survive, any termination of this Agreement.

**7)** **Acknowledgements.** You hereby represent and warrant, to the extent not prohibited by applicable law, to Happy Smiles as set forth on Schedule B.

**8)** **DISCLAIMER OF WARRANTIES.** ALL SERVICES, DELIVERABLES AND WORK PRODUCT, AND MODIFICATIONS, ENHANCEMENTS, IMPROVEMENTS AND/OR DERIVATIVE WORKS THAT ARE PROVIDED BY HAPPY SMILES HEREUNDER, ARE OFFERED ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS, AND HAPPY SMILES MAKES NO OTHER WARRANTY OR REPRESENTATION, ORAL, WRITTEN, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT THERETO, INCLUDING, WITHOUT LIMITATION, THEIR QUALITY, PERFORMANCE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, UNINTERRUPTED, TITLE, INFRINGEMENT OR ERROR-FREE OPERATION OR OTHERWISE HEREUNDER.

**9)** **LIMITATION OF LIABILITY.** UNDER NO CIRUMSTANCES SHALL HAPPY SMILES BE LIABLE TO YOU FOR ANY INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, INTERRUPTION OR LOSS OF BUSINESS, LOST GOODWILL, LOST REVENUE AND LOST OPPORTUNITY) ARISING OUT OF ANY OF THE TERMS OR CONDITIONS OF THIS AGREEMENT OR WITH RESPECT TO ITS PERFORMANCE HEREUNDER, AND ANY AND ALL LIABILITY HAPPY SMILES HAS OR MAY HAVE TO YOU IS LIMITED TO THE AMOUNTS RECEIVED BY YOU UNDER THIS AGREEMENT.

## 10)   **Miscellaneous**

**a.**  Any waiver of a provision must be in writing and signed by the party granting the waiver. Further, this Agreement can only be amended by a writing signed by both parties.

**b.**  Any failure or delay in exercising a right does not mean that right is waived, nor does partially exercising rights prevent a party from exercising other rights it has. This Agreement is personal to You. You may not assign or otherwise transfer any of Your rights or obligations.

**c.**  This Agreement is governed by Delaware law. Any dispute arising out of or related to this Agreement shall be subject to final binding arbitration. The arbitration shall be administered by the American Arbitration Association Arbitration (the "**AAA**") and shall take place within a 50-mile radius of Happy Smiles principal place of business or at such other venue as selected by Happy Smiles, in its sole and exclusive discretion, before a single neutral arbitrator selected pursuant to the Commercial Rules of the AAA. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., and judgment upon the arbitrator's award may be entered by any court having jurisdiction thereof.

**d.**  If a part of this Agreement is held invalid or unenforceable, then that part will be enforced as much as possible, or removed, and will not affect the validity or enforceability of the other parts. This is the entire agreement between Happy Smiles and You, and it supersedes all prior agreements, understandings, statement, representation, negotiations or discussions by and between You and Happy Smiles or any of its agents, employees or representatives.

**e.**  This Agreement and any other document contemplated herein may be accepted, executed or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act ("**E-Sign Act**"), Title 15, United States Code, Sections 7001 et seq., the Uniform Electronic Transaction Act ("**UETA**") and any applicable state law, and in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. Any document accepted, executed or agreed to in conformity with such laws will be binding on each party as if it were physically executed.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set out above.

**CLIENT:**

Name: Sama Muma

Business Name: Business Name

Phone Number: 5862299396

Address: 5622 Summers rd

North Branch MI 48461

**HAPPY SMILES LLC.**

By:

Name:   Nick Rafael Mocuta

Title:   Chief Executive Officer

Address: 9120 Double Diamond Parkway

Box H271, Reno, Nevada, 89521

**AUTOMATION ALLIANCE GROUP LLC.**

By: *Lise Audet*

Name:   Lise Audet

Title: Operations Manager

Address: 651 Broad Street Suite 206

Middletown, DE, 19709

**[SCHEDULE A AND B FOLLOW FOR INITIALING]**

**Name:** Jesse Regan

## SCHEDULE A

**DESCRIPTION OF SERVICES:** The Services to be provided by Happy Smiles are only the following: Perform all management functions for the Walmart Drop Shipping Business, including, but not limited to, customer service, product research and order fulfillment, all the while excluding any management of any of Your financial accounts.

**FEES:** You shall pay to Automation Alliance and Happy Smiles in accordance with the following:

      **(a)**    **Initial Fee**. You shall pay Automation Alliance an Initial Fee for the Services of twenty-two thousand five hundred dollars ($22,500) upon execution of this Agreement (the "**Initial Fee**").

      **(b)**    **Revenue Share**. There will be a weekly fee beginning in month 1 (after all required documents are received) and continuing until the termination of the Agreement, that's due each week following the conclusion of the preceding calendar week, You shall pay to Happy Smiles fifty percent (50%) of Net Profit from the sales (the "**Revenue Share**"). "**Net Profit**" means all revenue less inventory cost, returns, shipping fees and sales tax.

      **(c)**    **Acknowledgments**. You understand and agree that (i) if You fail to pay any of the Initial Fee, or the weekly the Revenue Share, Happy Smiles will have no obligation to, and may cease in its sole and exclusive discretion to, provide any Services to You; (ii) neither the Initial Fee nor the Weekly Fee are refundable. Note a deposit will hold the contractual initial fee price for 30 days, after 30 days you're required to pay the current initial fee and deposits aren't refundable; (iii) That you're required to cover the expense(s) of all software programs required to operate the stores and are required to cancel these accounts as they're 3rd party software's and not part of the Happy Smiles initial set-up or weekly fees; (iv) You must have a US LLC or Corporation, but this can be applied for after starting with Happy Smiles.; (v) You will need to become sales tax exempt, but this can be applied for after starting the service with Happy Smiles. (vi) You must have an Amazon Business Buyers account, but this can be applied for after starting the service with Happy Smiles. (vii) You have a minimum of $10,000 working capital/credit, you have the funds available for the set-up fee, to run and operate this business you aren't on your last dollar. By month 14th you'll need to ensure you have at least $30,000 in working capital/credit. (viii) All measures must be exhausted to open your Walmart account. (ix) **You fully and completely understand that the Drop Shipping model that will be ran on your account is 100% against Walmart's terms of service. Your Walmart or Amazon Business Account may get suspended, Happy Smiles/Automation Alliance will refer you to a 3rd party company to help get it back up and running at your costs. If attempts are unsuccessful and they can't get unsuspended, you may open 2nd Walmart or Business Amazon Account that Happy Smiles will continue your service on free of charge (no new set-up fee).**

Initial Here

DocuSign Envelope ID: 577379D9-35B8-4415-9F33-004671 1EF8A6

## SCHEDULE B

You represent and warrant to Happy Smiles that all of the following statements are true and correct and will remain so during the Term:

1.      You are not entering into this Agreement for the material purpose to start, begin, maintain, or operate a business, and you acknowledge, understand and accept that you remain at all times in control of your business, the Store, the Account and the Walmart Business, and that Happy Smiles is a provider of services for your business for which you has classified properly and for which is acting at all times under your direction, instruction and authority;

2.      No representation, assurance, claim or warranty has been made by Happy Smiles, its officers, directors, members, managers, employees, agents, or representatives relating, directly or indirectly, about whether You are likely to earn any income, generate any revenue, or improve Your business operations as a result of this Agreement;

3.      Happy Smiles does not make any representation or warranty, express or implied, as to (i) the potential success of the business venture contemplated hereby, (ii) the existence or viability of any market or demand for the Walmart Business, (iii) Happy Smiles providing any location or account, or assisting the You in finding locations or accounts, for Your Walmart Business, and (iv) the existence of any sales program, development program, production program or marketing program for the Walmart Business;

4.      You acknowledge, understand and accept there are no guarantees for profits or longevity of Your Walmart Business, and You understand all of the risks associated with this business model;

5.      You acknowledge, understand and accept that there are intangibles that may affect Your Walmart Business performance in sales and metrics, including, but not limited to, variables that are out of the control of all third-party sellers on Walmart.com, such as fluctuations in Walmart.com site traffic or competition;

6.      You acknowledge, understand and accept that You, as between you and Happy Smiles maintain 100% ownership of your Walmart Business, which gives You the ability to sell it or take over management duties at any time;

7.      You acknowledge, understand and accept that You are entering into this Agreement after making an independent investigation of Happy Smiles operations and not upon any representation as to gross revenues, volume, potential earnings or profits which You in particular might be expected to realize, nor has anyone made any other representation which is not expressly set forth herein, to induce You to accept and execute this Agreement;

8.      You have read this Agreement in its entirety prior to signing it, You have been given the opportunity to clarify any provisions that You did not understand, and You have either had an opportunity to consult, or have consulted, with an attorney of your choosing prior to executing this Agreement; and

9.      You acknowledge, understand and accept that Walmart may interpret, modify, change or amend its terms of service, terms and conditions or any other agreement governing the Walmart Business, any of which may have an adverse effect on the success, profitability or operations of the Walmart Business, such as by adversely affecting any drop-shipping operations or business model, which may result impair the Walmart Business, cause the suspension or termination of your Account or the Walmart

Initial Here 

Business, including by Walmart. In any such event, you will engage in all commercially viable efforts to cure each cause of such consequence; provided, however, that if you are unable to cure, then you will create a new account which Happy Smiles may agree to manage under this Agreement. Insofar as the suspension or termination of your Account or the Walmart Business results from your action or inaction relating to an issue other than drop-shopping, Happy Smiles shall have no obligation to manage any new account or Walmart business except as otherwise agreed in a new written agreement executed by a duly authorized representative of Happy Smiles; and

10.     You fully and completely understand the terms, conditions, restrictions, limitations, licenses, intellectual property rights, termination provisions and the obligations of this Agreement and agree to be bound thereby.

11.     You fully and completely understand the risk of opening multiple (more than 1 per household, not just as an individual) Walmart and/or Amazon stores/accounts. If multiple accounts/stores are opened it is not Automation Alliance or Happy Smiles fault if your accounts are suspended. As this goes against Walmart and Amazon's Terms of Service. If you still choose to open multiple accounts a VPN (Virtual Private Network) and VPS (Virtual Private Server) must be used at all times when in your Walmart or Amazon accounts, as both your Computer (Device) IP and your location's (Routers) IP Address.

Initial Here